# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

VERIZON NEW ENGLAND, INC., et al  . CIVIL ACTION NO. 08-11457-NG
    Plaintiffs                  .
                                .
        v.                 . BOSTON, MASSACHUSETTS
                                .
RNK INC.                       . SEPTEMBER 15, 2009
    Defendant               .
. . . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

  For the plaintiff:     KELLOGG, HUBER, HANSEN, TODD EVANS
                       & FIGEL, PLLC
                       BY:  Derek Tam Ho, Esq.
                       Sumner Square
                       1615 M Street, N.W.
                       Suite 400
                       Washington , DC 20036
                       202-326-7900
                       dho@khhte.com
  For the defendant:     Cahill, Gordon & Reindel LLP
                       BY:  Dean Ringel, Esq.
                       80 Pine Street
                       New York , NY 10005
                       212-701-3000
                       dringel@cahill.com

                       CAHILL GORDON & REINDEL, LLP
                       BY:  Laura C. Fraher, Esq.
                       And David Owen
                       1990 K Street, N.W.
                       Suite 950
                       Washington , DC 20006
                       202-862-8900
                       LFraher@cahill.com
Court Reporter:


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1                              **I N D E X**

2    Proceedings                                                3

3

1                    **P R O C E E D I N G S**

2        CASE CALLED INTO SESSION

3              THE CLERK:  Today is September 14th (sic).  The case

4   of Verizon New England Incorporated v. RNK Incorporated, Civil

5   Action 08-11457 will now be heard before this Court.  Counsel

6   please identify themselves for the record.

7              MR. HO:  Good afternoon, Your Honor, Derek Ho for the

8   Verizon entities, Verizon New England and Verizon New York.

9              THE COURT:  Okay.

10             MR. RINGEL:  Good afternoon, Your Honor, Dean Ringel

11  for RNK.  With me is Laura Fraher and David Owen.

12             THE COURT:  David?

13             MR. RINGEL:  Owen.

14             THE COURT:  Owen, all right.  Good afternoon.

15             Let me tell you a couple sort of procedural things at

16  the outset.  You can all sit down if you want.  First, I saw

17  the letters or letter or letters, I can't remember now, about

18  the discovery schedule and I'll address that and I'm sorry that

19  I didn't indicate in some fashion to you back in August if I

20  would do that when I addressed the motion, but that's my intent

21  and I understand that this has not moved as expeditiously as

22  probably anybody here would have liked and that's not really

23  the fault of any of you, but we've run through a lot of judges

24  to end up here.

25             So second – and I think we should address that after,

4

1   probably after the motion.  After I hear from you on the

2   motion I think it would be a better time for me to hear you

3   about that.  I'll just tell you something that I tell everybody

4   pretty much so that you get my standard speech whether you like

5   it or not, which is you have the right in a case such as this

6   as you do in any case, to consent if you wish.  So let me tell

7   you a couple things about that, what it means and what it

8   doesn't mean.

9          The first is if you don't do it there's no adverse

10  consequences to you or your clients.  Second, I'm not

11  interested in knowing what one side's position is on the

12  consent question.  I'm going to tell you about it and tell you

13  to think about it and if you find that you believe it's in your

14  interest or the interest of your client and you talk to the

15  other side and if they see it that way then all of you can

16  obtain from the website or from Ms. Simeone the form to consent

17  and you can file it.  And absent it being all of you's judgment

18  what you want to do, you don't need to report to me about, you

19  don't have to tell me anything about and I don't want to know

20  anything about it.  So you don't have to jump up, as some

21  people try to do, sometimes they tell me well Judge, we're

22  willing to – that doesn't make any difference to me.  I've got

23  plenty to do if you consent and plenty to do if you don't and,

24  frankly, whatever I do on this motion is going to be the same

25  whether you consent or you don't consent.  So it doesn't really

5

1  bear on it.

2       I tell you about it for a couple reasons.  One, it's

3  your right and not everyone appreciates that right.  Second,

4  you should understand as you probably do but, that if you do it

5  all you've done is change the judge but you have the same

6  rights, you have the same trial, the same jury pool and the

7  same appeal, the same everything.  What it – one thing to think

8  about that it might give you which may be what you want, it may

9  be what you don't want, which is it gives you the opportunity

10 sometimes to move the case more quickly for a couple reasons.

11      Later if this case goes that far if you're setting a

12 trial date, as a magistrate judge I can be more flexible with

13 you in setting a trial date than a district judge, not because

14 I'm a kinder, more flexible human being than Judge Gertner, but

15 because I don't try the felony criminal cases and therefore I

16 have more room on my trial calendar.  That means I can be more

17 accommodating to your schedules and I can be more accommodating

18 sometimes to witness' schedules and I can a little more easily

19 sometimes take things out of order or just work in a more

20 flexible fashion, and you think about that if that's something

21 you want.

22      Sometimes, though not at this moment applicable to

23 this case, it can be more efficient because those of you who've

24 experienced the report and recommendation process know that it

25 on one hand gives you an extra bite at the apple, but it also

6

1  creates an extra step which is more expensive for your clients

2  and more time consuming in that if there were dispositive

3  motions they would refer to me, you have the normal process to

4  resolving it and then you have the objections and the actual

5  determination of the district judge.  It's just something to

6  think about.  I bring it up in almost every case and so it's

7  there for you to think about.  You do with it what you wish.

8  If it makes sense for you, it makes sense to the other side,

9  file the form; if it doesn't, don't.  It's fine with me, you

10  don't have to report back to me, all right.

11         There are two motions.  I'd like to take Verizon's

12  motion first.  Maybe I'll cut to the chase a little bit.  Let

13  me tell you what my preliminary understanding of what's in

14  dispute and make sure I'm correct in my understanding of what's

15  going on and then I'll hear from both of you.  Verizon and RNK

16  had a, have a contractual relationship where they radically

17  send calls and route each other's calls or pass the calls off

18  in some form.  And sometimes Verizon is paying RNK for a

19  particular call and sometimes RNK would be paying Verizon for a

20  particular call and that turns on whether it's a local-to-local

21  call or a local to a virtually local but physically non-local,

22  call at least for purposes of this motion right now.  And one

23  way, if the call originated with the Verizon customer for

24  example one way Verizon would pay and the other way RNK would

25  pay.  And I confess to that as to which one pays in which

1  circumstance I'm a little confused back and forth, but I know

2  it flips depending on whether it's a VFX call or not.

3        So the, Verizon wants to get an array of information

4  from RNK which it says would, it needs in order to most

5  precisely determine how many of the calls were these VFX kind

6  of calls as opposed to the local calls.  And the kind of

7  information that it would like to have is basically the

8  customer, the phone number and the physical location of the

9  station so to speak and Verizon has its definition of station

10  verse defendant's who have their own definition of station.

11  And Verizon would like to get that information for the entire

12  time period which is two or so years I think and for all four

13  LATA and RNK said we'll give you the phone number, we'll give

14  you the station and we'll give you one LATA and if that's not

15  enough maybe later but not now, we'll see about the others and

16  propose six months time period.

17        The, that's my sense of what the – there's a little,

18  my sense is that RNK has pretty much agreed to, for purposes of

19  answering these discovery requests only utilizing Verizon's

20  definition of station with the exception of the calling card

21  category of customers for whom RNK says all we can tell you is

22  where their calling card platform equipment is, not where the,

23  a particular call ended up terminating; that is where that

24  platform sent the call off to after it received it.  And I

25  sense there might have been a little bit of disagreement as to

8

1  that particular term with Verizon, although I wasn't quite

2  sure.

3          So that's my sense of it, my understanding.  I

4  understand that, why Verizon, you know, why our end case says

5  we don't want to give out the customers basically for

6  competitive purposes and that it's unnecessary.  Verizon says,

7  no, we need them for verification purposes and our end case is

8  there's burden in producing all this information and that's why

9  they've to some cabined it the way they have and Verizon says

10  it's probably not burdensome and we really do need it.

11          So that's my sense to give you an idea of what I

12  understand.  I'll hear from – I have some thoughts on it, but

13  I'll hear from you both first.

14          MR. HO:  Thank you, Your Honor.  If I may just

15  clarify the--

16          THE COURT:  Sure.

17          MR. HO:  --the question that you raised which is who

18  pays who, when.

19          THE COURT:  Yep.

20          MR. HO:  Cause I think it's important to the

21  understanding of the economics or the economic implications of

22  this VFX traffic.  If the call from a Verizon customer to an

23  RNK customer is a local call, a true local call, then Verizon

24  pays RNK what is known as reciprocal compensation.  If by

25  contrast the call is not a local call, then RNK pays Verizon

9

1   what is known as access charges.  And what VFX traffic does in

2   terms of complicating that payment regime is that it allows RNK

3   to assign its customers numbers in such a way as to make a non-

4   local call look like a--

5            THE COURT:  Right.

6            MR. HO:  --local call so that it triggers at least,

7   you know, unless it's identified it would trigger a payment

8   obligation on the part of Verizon.

9            THE COURT:  As opposed to a receipt--

10           MR. HO:  As opposed to a receipt or a--

11           THE COURT:  --receipt.

12           MR. HO:  --or a payment obligation--

13           THE COURT:  Right.

14           MR. HO:  --on the part of RNK.

15           One other point of clarification--

16           THE COURT:  That I know.  I'm clear on that.  I just

17   could never - I was getting confused between which, whether

18   it's the local, which call triggers which, but, yes, I

19   understand that difference.

20           MR. HO:  Okay.

21           One other point of clarification as to the

22   definitional issue, RNK did say in its papers that it was not

23   refusing to adopt Verizon's definition, but there is one

24   important aspect of its compromise proposal in which that is

25   not the case.  So if I might turn the Court's attention to the

1  compromise proposal which is Exhibit F of Verizon's motion or

2  the memorandum.

3          THE COURT:  Does that differ from their description

4  in their brief at page nine to 11?

5          MR. HO:  I was caught off guard to be frank at the

6  representation that was made on page seven of the motion that

7  RNK has not refused to abide by Verizon's definition.  I was

8  looking at--

9          THE COURT:  Sometimes these things evolve between the

10  conferral process and the motion practice.

11          MR. HO:  Right.  So in the compromise proposal in

12  paragraph one RNK states for purposes of responding to

13  Verizon's discovery request RNK has defined VFX traffic as, and

14  then it more or less lays out the contractual definition.  And

15  in the last sentence of that paragraph it says RNK will provide

16  a definition of the term customer station as part of the

17  interrogatory responses contemplated by this proposal.  Going

18  on, in paragraph two which is kind of the meat of the proposal,

19  sub-paragraph A, they say for VFX traffic as defined above.

20  Now paragraph 2(a) is kind of the overarching component of this

21  proposal.  B, C, D and E go on to address some particular

22  forums of customers, conference calling services--

23          THE COURT:  Well let me just ask you this, they say

24  in their memo, and I can ask them just to clarify but, that –

25  let me find that spot I was looking at.  This is sort of page

11

1    nine to 11 but starting on page nine they say that RNK,

2    they're putting the past tense, agreed to provide, I presume in

3    the referencing that proposal, but in any event I understand

4    them and counsel correct me if I'm wrong, RNK, you're willing

5    to provide the full telephone number and the physical location

6    of each of those customer stations with respect to the area you

7    propose which is the one LATA and the six months, right.  And

8    what you mean by station is as to, well is easy to customers

9    who still exist, if any, like me, right, if you have a

10   landline.  But as to the other, as to the three you're really

11   fighting about, what you mean is what you say on page 10, this

12   sounded to me Mr. Ho like what you are seeking, that was the

13   bottom of page 10, for customer station the location of a

14   customer's modems and/or router for dial up as to the ISP's.

15   That's what you want I think there.  They'll agree to provide

16   the physical location of the modems and/or routers.

17          For the conference calling customers they'll offer the

18   physical location of the conference call platforms.  And for

19   the voice information services or the, I suppose these are long

20   distance access numbers for, access numbers for long distance

21   calling or other services like that, they would provide the

22   physical location of the calling card platform and that's where

23   they drop the footnote on page -'m sorry this is page six to

24   eight of their memo--

25          MR. HO:  Okay, I'm sorry.  I was having trouble

1   following, Your Honor.

2           THE COURT:  You know what it is; I'm looking at the

3   PACER page eight.

4           MR. HO:  Oh okay.

5           THE COURT:  The pagination just slightly different.

6   So to refer you back starting on page six at the very bottom of

7   the text is where they say they'll give the phone number and

8   the location of the stations.  And then the bottom of page

9   seven is where they define these three categories and say what

10  they'll give with the footnote carrying over on page eight

11  about the little nuance about the voice clones.

12          I guess my question is that, putting aside the LATA

13  and the like, that's what you want in terms of for discovery

14  purposes the definition of station is it not?

15          MR. HO:  That's true for purposes of the three

16  particular types of customers that we outline that raise some

17  kind of more complicated issues--

18          THE COURT:  Right.

19          MR. HO:  --as to what the definition of customer--

20          THE COURT:  Yes.

21          MR. HO:  --station is.  But for purposes of all other

22  customers not dial-up internet service providers, not

23  conference calling, not phone card.

24          THE COURT:  Not those three.

25          MR. HO:  My understanding, and I've actually sent

13

1  RNK's counsel a letter to this effect after their opposition

2  was filed, my understanding is that RNK is insisting on using

3  its own definition of customer station, not Verizon's.

4          THE COURT:  What would be the, other than these

5  three, what would, what do you want the customer station to

6  mean – as to these three you're comfortable with what they said

7  in their memo?

8          MR. HO:  Yes, and outside of those three I believe

9  that we, the two parties still have a differing conception of

10 what customer--

11         THE COURT:  All right, so other categories of

12 customers?

13         MR. HO:  Means, and it's my understanding, and again

14 I would welcome--

15         THE COURT:  What would be, what other kind of

16 customers would there be other than--

17         MR. HO:  Well, let's say, as you were hypothesizing,

18 your own landline, in Verizon's terminology the customer

19 station is simply the piece of equipment, telephone equipment

20 that picks up the call.  So if it is your landline at home the

21 customer station would be your telephone.

22         THE COURT:  All right.

23         MR. HO:  My understanding based on RNK's briefing is

24 that RNK has a different definition of customer station, namely

25 that there is some point along the way where RNK hands off the

14

1   call to its customer.  It might not be the telephone or the

2   modem or the conference calling platform or the calling card

3   platform.

4            THE COURT:  What if I have a landline phone at my

5   house and I have it on forward to my cell phone, is the

6   station, and I get a call in the morning when I'm en route

7   between home and work, is the station, and RNK doesn't provide

8   my cell phone service.  They just provide, they don't in fact

9   that as far as to my knowledge, provide any of my phone service

10  but for purposes hypothetical they provide the landline

11  service.  Is the station for that phone number the location of

12  my phone at home, my home address or if it's on forward to my

13  cell phone would it be the location of my cell phone?

14            MR. HO:  I believe in that context, although I

15  haven't thought about that before now, but I believe in that

16  context the customer station would still be the landline, the

17  telephone that picks up the call and then routes it forward

18  along the path at your direction to your cell phone.

19            THE COURT:  What if that routing, presumably RNK

20  offers a service maybe to forward calls through their system as

21  opposed to some function embedded in my physical telephone, but

22  if I exercise that function on their system and in fact didn't

23  even have a phone at home?

24            MR. HO:  Well, I think one issue is, the phrase at

25  issue is the customer station.  So it has to be a piece of

15

1  telephone equipment that is owned and controlled by the

2  customer and that receives the call.  So it's--

3              THE COURT:  What if it's rented by the customer?

4              MR. HO:  I would think that that would apply--

5              THE COURT:  You still must have people, I know people

6  who rent phones still, not many, they're aging out of the

7  population but I mean - no, but I'm serious.  I mean I'm just

8  trying to be practical here.  What happens if it's a rental

9  phone from AT&T or whatever it got spun off, right?  It's a

10 contract that goes back to the days when AT&T was the only

11 phone company probably.  Or what if I don't have a phone?  I'm

12 thinking about an instance and I don't, like what if there are

13 customers who have no physical phone?  They own, they have a

14 phone number with RNK, and I don't know, maybe RNK doesn't

15 offer this service and so maybe it's hypothetical, but I have a

16 sense that there are telecommunication numbers, you can get a

17 phone number and the you just, it's all virtual, it's truly

18 virtual in the sense that you just forward it to somewhere

19 else.  It doesn't have a line that it originates into your

20 home.

21             MR. HO:  Addressing the rental, I think rental and

22 ownership probably there isn't a distinction there.  I think

23 with respect to, you know, completely virtual telephone

24 services I'm not sure what it is that would be picking up the

25 phone on the other, the call on the other end of the line.  But

16

1   I think our kind of straightforward definition, and this

2   really goes back to the definition of the term station way back

3   when the 1934 Act was passed, it was straightforwardly the

4   piece of telephone equipment that picks up the call.  And so

5   for purposes of our definition in these discovery requests,

6   that's the theory that we're operating on.  That's the

7   definition that's in our request.

8           THE COURT:  So it doesn't turn so much on the, on

9   whether it's – what you really mean, if you do, is what

10  equipment the customer designates in the ordinary course to

11  pick up the phone?

12          MR. HO:  I think some of these--

13          THE COURT:  So if it were a virtual call – let's

14  suppose, cause I think there are such things, and you all might

15  know better than me, but I think there's virtual phone numbers

16  where you have no phone and it's picked up by a server at the

17  company that supplies the phone number unless you choose to

18  forward it to, and you can check voice mail, it's just a voice

19  mail box effectively, you can check the voice mail on the

20  internet and then you can forward it, and then presumably what

21  you're saying is that maybe the regular station is wherever

22  that company is because it's what you designated.

23          MR. HO:  Right, and that may well be analogous to the

24  internet service providers modem banks where, which are the

25  thing that receive the call.  Obviously the call isn't designed

17

1   to contact the modem.  That's not the end of the line in terms

2   of what the customers, the internet service provider customer

3   is trying to achieve but that's the piece of equipment that

4   actually picks up the phone when the Verizon customer uses her

5   modem to dial another modem.

6           THE COURT:  Right.  So getting back to the dispute

7   the set with the three, but as to everybody else what you're

8   saying you want the definition to be what and what do they

9   disagree with?

10          MR. HO:  Our definition again is that the customer

11  station is the customer's equipment that actually receives the

12  telephone call.  And my understanding from RNK's opposition and

13  from their response to my letter is that they have a different

14  definition which is that somewhere along the way from, you

15  know, RNK to what we would define as the customer station, RNK

16  may designate a kind of stopping point I think is the term that

17  they use which they would describe as the customer station.

18  And so the advantage of that as you can imagine from RNK's

19  point of view is that rather than have the customer station be

20  a matter of kind of physical reality, it can be kind of

21  anywhere along the line that people designate it to be and that

22  gives them a lot more flexibility to make things VFX when in

23  fact the person receiving--

24          THE COURT:  Make things, on no VFX.

25          MR. HO:  Well, well--

18

1      THE COURT:  You want them, they would want to make

2  it local.

3      MR. HO:  Right, to make it look local when in fact

4  it's VFX--

5      THE COURT:  Right.

6      MR. HO:  --I guess would be the most accurate--

7      THE COURT:  Well let me just ask them that.  What's,

8  other than the three categories I describe, I refer to your

9  memo about, what's your view of what a customer station is, not

10 in the law or in the contract but for purposes of responding to

11 the discovery request?

12     MR. RINGEL:  Your Honor our position is that it's

13 where we hand off the call to someone else.  I think that one

14 of the things that's true in this world is there are many

15 players here and it may be that the handoff occurs earlier than

16 Mr. Ho's description.  I would refer Your Honor to what I think

17 is the definition that I thought Mr. Ho was using which occurs

18 in Exhibit C to the--

19     THE COURT:  You know, I confess that in this

20 paperless virtual world I often don't print the exhibits.  I

21 read the relevant portions online.  Does one of you have an

22 extra copy of the exhibits so I can refer to them during the

23 hearing?  I did not print all the exhibits out to bring down.

24     MR. HO:  I apologize that I do not have an extra

25 copy.

19

1          THE COURT:  That's--

2          MR. HO:  --but I do--

3          MR. RINGEL:  Let me, if I may approach?

4          THE COURT:  You can approach.

5          MR. RINGEL:  Let me--

6          THE COURT:  If you want to come up, Mr. Ho, you can

7    so we're looking at the same.

8          MR. RINGEL:  Maybe we can share this for the moment.

9          THE COURT:  Sure.

10         MR. RINGEL:  I think I remember what it is I want to

11   say about this paragraph.

12         THE COURT:  Oh, all right.  Fine.

13         MR. RINGEL:  What - this is the definition in the

14   interrogatories.  It's No. 25 in the instructions I think or in

15   the definitions.  And you'll see I underlined it, Your Honor,

16   before I realized I was going to be handing it up to you.

17         THE COURT:  That's okay.

18         MR. RINGEL:  And the focus is on end user.

19         THE COURT:  This is your answer or your def--

20         MR. RINGEL:  No, no, these are his definitions.

21         THE COURT:  Oh, his definitions.  Okay.

22         MR. RINGEL:  And if you notice he has the three

23   categories, the calling card platform, the dial-up ISP and the

24   conference call but--

25         THE COURT:  The location of the end user in the call

20

1    determine.

2         MR. RINGEL:  --for the third one which seems to be

3    the catch all category he's now talking about, he isn't talking

4    about the customers equipment.  What he's talking about there

5    and I think it matters is the end users and that's the

6    complication, Your Honor.  That's information we don't have,

7    and what it does and it illustrates for us really the heart of

8    the problem here, the reason this is so difficult, is there

9    isn't any real definition of VFX either in the agreement or is

10   there a definition of the customer station which is what we're

11   having this discussion about.

12        I think even what you just heard from Mr. Ho what he

13   said to you now is a little different.  And I understand why

14   he's going there, I'm not suggesting anything in appropriate in

15   his going there, but it's different from the words that here.

16   And it's this concept of end user that is just so difficult to

17   come to terms with.  It's not in the agreement.

18        THE COURT:  Well is the end user, could the end user,

19   whatever that means, be different than the customer?

20        MR. RINGEL:  It could be, sure.

21        THE COURT:  I mean, who's the cus--

22        MR. RINGEL:  Our customer may not be the end user.

23   If, for example, you imagine a calling card it may be that it

24   goes to the customer, the calling card company's facility--

25        THE COURT:  All right.

21

1          MR. RINGEL:  --and then it goes on to someplace

2    else.  He is talking--

3          THE COURT:  And in that circumstance as to calling

4    card customer he's agreed to take the location of the calling

5    card platform.

6          MR. RINGEL:  I know he's seeking to go beyond that is

7    my understanding.  We have offered to give him that but he

8    wants more than that and that's in part my understanding of why

9    he wants the names of customers because he wants to use that

10   information to attempt to obtain the information he wants which

11   is who is the end user, where are they located.  We, as Your

12   Honor appreciates--

13         THE COURT:  That's why, I was trying to figure out--

14         MR. RINGEL:  --have lots of problems--

15         THE COURT:  --why the customers were so significant.

16         MR. RINGEL:  Yes.  I think both for that purpose and

17   he describes it as for purposes verification which is another

18   way as I understand it and I read the papers of going to the

19   customers and saying gee, we want to talk to you.  These are

20   customers who chose not to deal with Verizon.  Your Honor's

21   well aware of the fact that the CLEC exchange carriers like my

22   client and the ILEC like Verizon don't always get along in

23   wonderful fashion and the customers are quite aware of that.

24   They made choices as to whom they wish to deal with and the

25   idea of turning over customer information to Verizon is very

22

1    troubling.

2           THE COURT:  But when you give them the phone number,

3    when you turn over the phone number how hard, I mean it's not

4    very hard for me to go on the internet and take a phone number

5    and find out whose phone number it is or at least some idea

6    whose phone number it is.

7           MR. RINGEL:  I think that potential is there, it's

8    always been there.  I think they actually have access to many

9    of those numbers if they want to do it.  What they're asking

10   for though is a complete list of customers.

11          THE COURT:  Right.

12          MR. RINGEL:  And that's very different, Your Honor.

13          THE COURT:  Yes.

14          MR. RINGEL:  We are in competition with them.

15          THE COURT:  No, I understand.

16          MR. RINGEL:  That's troubling.  And this all comes

17   back to the end user concept which is embedded in the

18   definition and which wasn't the focus of the dialogue that Your

19   Honor just had.

20          THE COURT:  So why isn't it, Mr. Ho, enough for

21   whatever universe of information they give you for purposes of

22   discovery to give you where they hand, where their customers'

23   equipment is that they hand the call off to?

24          MR. HO:  If I may, Your Honor, as to the calling card

25   issue, and I think there is a little bit of confusion, we would

23

1  accept the calling card platform as the customer station

2  consistent with--

3        THE COURT:  Right.

4        MR. HO:  --their proposal.  Where we are not on the

5  same page I think is the customers aside from the three types.

6  We identify what we know to be three types of customers that

7  RNK, we believe RNK to have where there may be a distinction as

8  Mr. Ringel was saying between the end user--

9        THE COURT:  Right.

10        MR. HO:  --and RNK's customer.  For clarification we

11  said, okay, for those--

12        THE COURT:  Well take the customers.

13        MR. HO:  --three customers we're going to--

14        THE COURT:  But as for everyone else what would be an

15  example first of all of somebody else where the customer would

16  be different than whatever the end user is?

17        MR. HO:  We, in framing our definitions, we weren't

18  aware of any which is why we use the term end user to be

19  equivalent to the customer's physical equipment like through a

20  telephone.

21        THE COURT:  Oh but if he says to you as a practical

22  matter, okay, that he – is it possible for him in any realistic

23  way to give you more than if he gave you everything?  Here's my

24  customer and here's where their equipment is, wherever it ends

25  up.  That's essentially what he's agreed to give you on those

24

1  three categories.  Why would it be different on the other

2  categories, forgetting about whatever an end user is?

3          MR. HO:  If what Mr. Ringel is offering is to provide

4  the information about where the customer's equipment is that

5  receives the call--

6          THE COURT:  RNK's customer.

7          MR. HO:  RNK's customer and not some kind of notional

8  hand off point or some other point where--

9          THE COURT:  Well, let's just ask him, is that what

10  you're offering to give as to everyone else?

11          MR. RINGEL:  Yes.  We don't accept that as the

12  appropriate definition but we are willing to do that.

13          THE COURT:  Right.  No, I'm not asking you to accept

14  it as a definition.  I'm just saying for purposes of discovery

15  you'll give to him in response to this request the, putting

16  aside these three categories which we've got an agreement on

17  between all of you, as to the rest of whatever information is

18  produced you'll give him the, your customers' physical

19  equipment location which is essentially what you agreed to give

20  them on the first three.

21          MR. RINGEL:  I think so, Your Honor, that frankly

22  this has not been subject of exchange between us this focus on

23  things other than the three categories.

24          THE COURT:  Right, I understand that.

25          MR. RINGEL:  I--

25

1        THE COURT:  I know I didn't see it in the papers.

2        MR. RINGEL:  Indeed I'm not even sure; my hesitance

3   is I'm not quite sure that I know what's in this category.  I

4   would like the opportunity to consult with the client on that

5   issue.  Theoretically, if it's doable I don't have a great

6   problem with it, but I don't understand it well enough because

7   this isn't a discussion we've had.

8        MR. HO:  Respectfully, Your Honor, I sent a letter to

9   Ms. Fraher on May 26th in which I asked this very question.  I

10  said I was intrigued to see in your motion or in your

11  opposition rather that you are saying you're not refusing to

12  accept Verizon's definition.  I identified the discrepancy that

13  I have noted, which is that apart from the three types of

14  customers, with respect to all other customers they seem to be

15  saying in this proposal that they will use their own definition

16  and that they will supply that definition.

17       THE COURT:  The proposal predates the opposition?

18       MR. HO:  Yes.  So I wrote a letter trying to clarify

19  this which I'm happy to hand up if Your Honor would like.

20       THE COURT:  No.

21       MR. HO:  And the response that I got was, no, you

22  have not misunderstood our proposal.  We do intend to use our

23  own definition.  If that's--

24       THE COURT:  Well, I think--

25       MR. HO:  --now changed I don't know what we're--

26

1          THE COURT:  --it's clear that as to the three

2    they've agreed to use--

3          MR. HO:  Right.

4          THE COURT:  --your definition.  And the – go ahead.

5          MR. RINGEL:  Your Honor, the understanding was on our

6    part, it may have been wrong, Mr. Ho, but our understanding was

7    we would still focus on the three categories which has always

8    been the thrust of the discussion.  And we were reemphasizing

9    that we were standing by the proposition that we would make

10   available according to your definition for those three

11   categories, which are the three they've identified, that we

12   were going to accept them for purposes of the discovery

13   proposal.  I think on this last item - I do hear what you're

14   saying.  I have to tell you we didn't understand that to be

15   what you were asking.  I'm happy to inquire.  I don't have any

16   particular reason for opposing it, but I can't with assurance

17   tell you--

18          THE COURT:  Sure.

19          MR. RINGEL:  --that we know it's doable.

20          THE COURT:  Right.  Okay.  All right.  Let me put

21   that question to the side for the moment.  It sounds, I will

22   tell you off the cuff without, this isn't my ruling on this

23   question but it sounds reasonable to me that you would have to

24   produce the, absent some other technical reason why it's not

25   feasible or possible, what have you, but sort of the location

27

1    of your customers equipment sounds like a natural place.  I

2    understand once it hits your customers' equipment, you might

3    not know where it goes.  There are all sorts of reasons why

4    that might be but you have a customer and presumably in some

5    fashion might know where their, should know where their

6    equipment is or where you're sending the call, if you will,

7    which I think is really what, the same thing.  It may not but

8    it sounds to me like it's the same thing.

9             MR. RINGEL:  Yes, and I'm not taking issue with that,

10   Your Honor.

11            THE COURT:  Yes and so it sounds--

12            MR. RINGEL:  So whatever technical issue--

13            THE COURT:  I understand.  So it sounds reasonable.

14   I understand why you might want to consult with your client and

15   so be it.  So Mr. Ho let's suppose for the moment that's

16   resolved, that they agree for purposes of the discovery motion

17   to give you whatever they're going to give you, they're going

18   to give you the location of the customers equipment that

19   they're delivering the call to.  You're satisfied with the

20   three.  That satisfies you on the, everybody else, I think.

21   Then what else is there?

22            MR. HO:  There are two remaining issues, Your Honor.

23   One - I think you've identified both of them.  One is RNK

24   required to provide the identity of customers that receive VFX

25   traffic, and the second is these limits that RNK has imposed as

28

1   to time--

2           THE COURT:  The time and geography.

3           MR. HO:  --and geographic location.

4           THE COURT:  So let me ask you first, why do you need

5   the customers' name?

6           MR. HO:  For two reasons, Your Honor.  One, RNK has

7   said in its own opposition that it doesn't always have the

8   information that we're seeking, namely the location of the

9   customer station in particular.  And where that is the case

10  Rule 26(b) provides fundamentally that Verizon is entitled to

11  know the location and identity of persons that may have

12  relevant information.  Those customers know obviously where

13  their own physical equipment is that picks up the call.  If RNK

14  doesn't always know that, as it has indicated in its

15  opposition, we are entitled to have that information.  Even if

16  RNK does know that information, I think there is an interest in

17  Verizon being able to verify the information.  A lot of what

18  you read in RNK's opposition seems to indicate that they don't

19  keep kind of systematic and necessarily complete and accurate

20  records of where their customers' physical equipment is

21  actually located.

22          THE COURT:  You've represented defendants, right?

23          MR. HO:  I have.

24          THE COURT:  Defendants never have complete--

25          MR. HO:  They're never as perfect as we--

29

1   THE COURT:  --and accurate records of whatever the

2   plaintiff is interested in, do they?

3   MR. HO:  They never do.  And I think, you know, one

4   issue obviously is the burden of trying to put everything

5   together in the way that we've asked for it but the other is,

6   you know, is there going to be, are there going to be

7   inaccuracies and does Verizon have the ability to essentially

8   delve their records.

9   THE COURT:  Well, let me ask you both this question.

10  It strikes me that what you, the scope of what you want - I see

11  given your theory and they have a different theory and I don't

12  know what the answer is as to the correct theory, but at this

13  moment I don't have to figure that out, but I see why what you

14  want would be sort of all the information to allow you as

15  precisely as possible to support your theory, okay.  And that's

16  why you asked for it.  It makes sense.  But you don't really -

17  it strikes me that, and this is - you don't really need all of

18  the information in order to prove your theory.

19  In other words if this case went to trial there is

20  no, right now - there's no way Judge Gertner would ever let you

21  prove up every single phone call, every single phone number of

22  say their - how many customers do they have, 10,000 or how many

23  calls that their customers made in a two-year period of time,

24  10 million.  You're not going to be trying this case in federal

25  court phone call by phone call, and I know you wouldn't intend

30

1  to try it that way.  But my point is that why wouldn't for

2  example, and this is something to think about for the

3  defendants as well, whatever the scope is of what is discovered

4  why, why wouldn't the statistical, a random sample of some of

5  their customers, some of the phone numbers, be sufficient?

6        In other words if you looked at it from a statistical

7  perspective there's deeply diminishing returns to the value of

8  looking at each additional one of their customers after you've

9  looked at some percentage.  And the value of looking at a

10  hundred, you want 100% and that's what you're asking for and

11  for the period in play, and I'm not faulting you on this, I

12  mean, but I understand why you, you want that.  But why

13  wouldn't some random, not a selection, but why would, you know,

14  take a random sample.  Why doesn't a random sample be

15  representational?  It would be, it might not be perfect but

16  what case have you ever done in which discovery was perfect?

17  And it would, and why wouldn't that be - I mean really what

18  you're trying to do is get an idea what percent of their calls

19  fall into categories that clearly are VFX or fall into

20  categories that you have a decent argument that are VFX and,

21  therefore, you might be able to push to the VFX box as opposed

22  to them push to the local box, right?

23        MR. HO:  Right.  A couple of things, if I may.  One,

24  the representative sampling is a problem in the sense that we

25  don't know how to take a representative sample at this point.

31

1  RNK has suggested that it would be limited to LATA 126.  We

2  think that is clearly not representative.  LATA 126 is western

3  Massachusetts which comprises only I think 2%--

4          THE COURT:  Well, it's not that you don't know how to

5  do it.  You just don't agree with their way to do it.

6          MR HO:  Well, but it would have to be a

7  representative sample A within each jurisdiction because we've

8  got three jurisdictions involving two separate companies.  So

9  we've got one claim on behalf of Verizon New York.  The traffic

10 patterns and the customer--

11         THE COURT:  I mean, what's wrong with just taking a

12 representational sample across their four LATAs?

13         MR. HO:  I think in theory we might be willing to do,

14 to try out something like that, but I guess the question is, is

15 that really any more or less burdensome or less burdensome then

16 doing the whole thing because we are probably going--

17         THE COURT:  Well what do you think?

18         MR. HO:  --to have to come up with a methodology to

19 determine how to do a representative sample that everyone

20 thinks is fair and accurate.

21         THE COURT:  Why wouldn't it just be a random

22 selection of X number?

23         MR. HO:  X number of?

24         THE COURT:  Phone number of their customers.  Right,

25 this is - you're getting this production by phone number from

32

1    them, right?  So why wouldn't it be a random — I mean, you can

2    go on the internet for free and get a random number generator.

3    Their proposal is they number their, essentially number their

4    clients anonymously from one to X through what they produce so

5    why not just let them number them and then take a random

6    selection of those, whatever the percentage is, and then those

7    are the ones.  The work, the burden strikes me that they

8    articulate in their affidavit is there's a burden associated

9    with each customer.  They have to figure some things out with

10   respect to each customer.  So the burden, double the number of

11   phone numbers, you double, potentially double the burden.  On

12   the other hand over time after you reach some, obviously, you

13   know, at some point there's diminishing returns to looking at

14   more phone numbers assuming you're taking a random selection

15   across the four LATAs.

16            MR. HO:  I think our concern would be that, you know,

17   the devil is in the details.  That if we have, if we have an

18   assurance that, you know, we'd have a complete list of

19   telephone numbers of RNK customers that receive VFX traffic and

20   we can see how the representative sample is generated, maybe

21   there would even be some kind of methodology to verify that

22   it's in fact representative.  But I think, I mean I think the

23   concept is okay and in fact when Verizon and RNK were

24   negotiating this before the lawsuit was filed this was what

25   they tried to do, but it broke down over squabbles about is

33

1  this representative, are people providing the right

2  information.

3          THE COURT:  Well, I think that look, there's a

4  certain amount, you're each right, that that was in the

5  details, there's a certain amount that there's, you know, there

6  are different ways to take representative samples all of which

7  might be reasonable but not everyone might agree but you have

8  me.  If you can't agree I can agree with myself and tell you

9  and, but it just seems like - I mean you have, the assurance

10  you have is the assurance, the same assurance really you get

11  that they produced all the responsive documents, right?  I mean

12  that's a fundamentally, you know, in the ordinary course a

13  99.9% of the cases the assurance you have is that the other

14  side said they did.

15          MR. HO:  I guess one additional concern would be that

16  right now there's an informational asymmetry.  They know the

17  customers' identity and one of the things that we were

18  concerned about is if we try to do some kind of estimation--

19          THE COURT:  What happens when one of their customers

20  makes a local call to one of your customers?

21          MR. HO:  They pay us if it's a local call.

22          THE COURT:  And what if one of their customers makes

23  a call to one of your customers who's got a ISP dial-up.  It's

24  a Framingham customer.  They have a customer, a landline

25  customer in Framingham with a phone that they own at a physical

34

1   location in Framingham with a Framingham exchange phone number

2   who dials a Framingham exchange phone number that's an AOL

3   number where the modems located in Virginia.  And AOL is your,

4   it doesn't really matter who the customer is, I suppose AOL, is

5   but the landline customer is their customer and it goes through

6   you.  Then they would pay, it's their customer?

7           MR. HO:  I'm not sure that actually exists in

8   practice.  I'd have to go back to the contract to see if it

9   covered--

10          THE COURT:  In other words what if it's the flip.

11          MR. HO:  What if it--

12          THE COURT:  You said--

13          MR. HO:  --was the flip, right.

14          THE COURT:  --flip, right.

15          MR. HO:  I'm not sure whether the contract covers

16  both directions or if it only covers the one because my

17  understanding, although I don't have 100% certainty about this,

18  is that there are no such arrangements going the other way.

19          THE COURT:  Okay.  All right.  Fine.  So they would

20  say as an informational asymmetry cause it goes one way or by

21  and large mostly one way and they, these are their customers so

22  they know.

23          MR. HO:  Right.  And so the concern would be that,

24  you know, we, if we where to do some--

25          THE COURT:  You don't trust them.

35

1    MR. HO:  --kind of representative sampling or if we

2  were to do some kind of estimate, they'd then come back with

3  actual data about the customer and say well actually you

4  thought that by doing this reverse engineering for example, if

5  Verizon goes and looks up the, a telephone number on the

6  internet and the service that it uses says that the customer is

7  location is in Framingham, well RNK actually knows where it is

8  because it has that information.

9    THE COURT:  No, but I'm saying if you do a

10  representational, you're going to find out where the cus -

11  they're going to tell you as to this customer this is where it

12  is.  You just litigate about the representational sample as

13  opposed to about everybody.  In other words there's phone

14  number one, two, three, four.  They say well that one's

15  located, that's an ISP and this is where they are or this is a

16  landline phone here or whatever it is.

17    MR. HO:  I think if there were some, again, assurance

18  that they could not come back and cite actual information that

19  they have that they didn't agree to provide to RNK as a means

20  of attacking whatever the result is of this representative

21  sample, that's the concern that we have cause they have the

22  information and we don't.  If they can then use that--

23    THE COURT:  What do you say about this idea, Mr.

24  Ringel?

25    MR. RINGEL:  Your Honor, I'd like to first clarify

36

1  under the proposal that Your Honor has been talking about,

2  we're not talking about disclosing the identity of customers as

3  a group are we?  I'm not clear--

4         THE COURT:  No, I have to say I'm disinclined to

5  order the disclosure of the customer--

6         MR. RINGEL:  All right.

7         THE COURT:  --but I'll hear both of you on that.

8  What I'm talking about right now is what if you did, what if –

9  essentially my idea, which you don't have to accept or you

10 could tell me why it's a bad idea if you wish, is that you

11 simply take a sample.  The burden that you have described, your

12 client stated in the affidavit is a burden associated with each

13 phone, every time they look at one more number it's a burden

14 associated with answering the document request or interrogatory

15 number by number, some numbers more burden than other numbers.

16 And so I'm saying why not just take a rep, you know, a

17 percentage across the board.

18        I see their point why the Berkshires might not look

19 like Manhattan in terms of the calling paradise and, so why not

20 just take a represent - two questions, one, why not do a

21 representational sample as opposed to everybody, X percent.

22 You know, my thought was boom, you've got a hundred customers,

23 take a random selection, generate some random numbers and take

24 whatever random selection of those numbers and that would be

25 sufficient.  It'll be a sufficient basis to litigate on and

1    then you respond as to those.

2            MR. RINGEL:  Your Honor, a few thoughts.  One, just

3    to be clear, the specific LATA 126 was chosen because of its

4    minimal burden because the parties have been down this path.

5    They have each worked with that LATA in the context of trying

6    to figure out VFX.  So that the burden would be less in trying

7    to do that than even if you will the equal number on the

8    representational sampling that Your Honor's talking about.

9            THE COURT:  Right.

10           MR. RINGEL:  So I think there's at least a burden

11   reason why the LATA 126 might make some sense.  I think what

12   Your Honor is suggesting certainly does deal with some of the

13   problems that are being identified.

14           I do want to respond though because I think this

15   informs all of discussion to the idea of the informational

16   asymmetry that Mr. Ho deals with.  I think it's important, and

17   we are sort of taking it's a given their litigation definition

18   in theory.  I understand why we're doing it but this contract

19   was perhaps the first one we know.  It's among the first that

20   ever talked about the effects.  It barely defines it.  All of

21   us have drafted contracts.  This is not the language that a

22   draftsman who actually had an idea of what it was he or she was

23   talking about would do.

24           One of the things it is very clear on, however, is

25   that the party who was coming in to set aside to renegotiate

38

1   the presumption, this 20% number, which is the starting point,

2   which as far we can tell it's picked out of the air, has to

3   bring data to bear at the time they seek the renegotiation.

4   The point being, the assumption was the data whatever it may be

5   that speaks to this definition would be in the hands of both

6   parties.

7           THE COURT:  So that assumption especially by people

8   who didn't really know what they were talking about cause no

9   one was figuring this out cause it was all evolving, might just

10  be an, you know, might be an implied assumption.  It's just

11  really not that accurate and not one that's--

12          MR. RINGEL:  That may be right but it's not clear,

13  Your Honor, to me at least, that it follows from that that

14  therefore the failure of the definition should be remedied by

15  an enormous swath of discovery.  This is not to reject Your

16  Honor's proposal, but it is to suggest that we're going the

17  long way down the path by saying, okay, we'll give them the

18  kind of discovery that basically meets--

19          THE COURT:  Well, what's your definition of the

20  customer station?

21          MR. RINGEL:  Our definition?  Where the call is

22  handed off by RNK to somebody else, whoever that somebody else

23  is.

24          THE COURT:  Which might or might not be where your

25  customer, you might not be handing it off to your customer.

39

1      MR. RINGEL:  Well, we'd be handing off for our

2  customer whether or not that is where its physical facilities

3  are located.  It might--

4      THE COURT:  So in other words you might hand it off

5  to your customer not where their modem is located?

6      MR. RINGEL:  Perhaps in some cases, yes, that's

7  right.  That's right.  And I'm not here to argue between--

8      THE COURT:  I understand, okay.

9      MR. RINGEL:  --the accuracy of that definition.  My

10  point being simply that in talking about the informational

11  asymmetry, A, that's not what the contract assumed.  Rightly or

12  wrongly the contract assumed--

13      THE COURT:  Right, but you just persuaded me that the

14  contract was written by people at a time when--

15      MR. RINGEL:  Yes, but what follows, I think what

16  follows from that is that it may not be the, if you will, the

17  free pass to enormous and burdensome discovery.  And what I'm

18  suggesting is that in talking about the discovery we ought to

19  bear in mind that this was not something that the parties

20  contemplated as far as in terms of cost.

21      THE COURT:  How much money is at issue at 20% in a

22  given year?

23      MR. RINGEL:  I'm sorry?

24      THE COURT:  How much money would your client pay

25  Verizon if the rate is 20%?  About?

40

1    MR. RINGEL:  Don't know the answer I'm sorry to say.

2    Mr. Ho may.  I don't.

3    MR. HO:  I don't.  If I had to guess, I mean it's in

4    the millions I think.

5    THE COURT:  In the one to five or the 10 to 50?

6    MR. HO:  I don't know.

7    THE COURT:  Okay.

8    MR. HO:  The parties' claims and counterclaims are,

9    roughly putting aside the declaratory judgment piece of

10   Verizon's claim, the claims and counterclaims are in the teens

11   of millions of dollars--

12   THE COURT:  Okay.

13   MR. HO:  --going each way.

14   MR. RINGEL:  (inaudible - #2:47:49), that's right,

15   Your Honor.

16   THE COURT:  All right.  So I hear that point but it

17   seems to me that it's a, you know, it's not a – it's at least a

18   plausible definition at this stage from what I know, Verizon's,

19   not that I know a whole lot about what the definition ought to

20   be.  To some degree it seems to me that THE burden can be

21   accounted for by what the percentage is.  There's sort of two

22   tensions, right.  There's the burden tension and there's the

23   sort of doing enough to make it useful, meaningful, perhaps not

24   useful.

25   MR. RINGEL:  Your Honor, and that's why we made what

41

1    I think is quite a serious proposal to deal with this.

2              THE COURT:  Right.

3              MR. RINGEL:  We understand--

4              THE COURT:  The problem I have with the LATA, the

5    Berkshire LATA, it may be that it was selected for whatever

6    reason at the beginning.  There's nothing that's been presented

7    to me that says the parties agree to only use that as the

8    representational sample and they didn't agree to be bound to

9    that.  If they had I'd say that's it, you're done with that.

10   But since they didn't do that and since it encompasses FOIA at

11   least sitting where I sit and from what I know Manhattan looks

12   a lot different than western Massachusetts, and even Boston

13   looks a lot different than western Massachusetts, and I would

14   think the whole phone patterns in the like and my ephemeral

15   sense of how the world is evolving and changing is that, you

16   know, it may look – the phone world might look a lot different

17   in Boston, New York and San Francisco than it does in

18   Pittsfield.  You know, different economy, different

19   demographics, all sorts of different factors going on separate

20   and apart from more or less people.  So these things, it might

21   be meaningful.

22             On the other hand, I'll tell you that it's the idea

23   of doing all, every customer in all four LATAs, Mr. Ho, I just,

24   I don't see why that's, how that's reasonable.  I understand

25   why it's helpful to you.  I understand why in a perfect world

42

1  that's every piece of paper that would be relevant, but

2  particularly for an issue like this I don't really see why you

3  need every single one.  That might persuade me you need a

4  bigger percentage or a lower percentage, but I think you'd be

5  hard-pressed to persuade me that if you had a reasonable

6  statistical sample of all their customers what the utility

7  would be of getting the rest.

8          MR. HO:  One other representational issue I guess is

9  the issue of duration of the timeframe.

10         THE COURT:  Right.

11         MR. HO:  Our sense is that these traffic patterns can

12  in fact change quite significantly over time.  RNK has offered

13  a six-month window, the six months prior to this proposal I

14  believe.  We made our request in early 2008, I think it was

15  April, and we requested a broader timeframe in order to

16  understand whether--

17         THE COURT:  Two years was it?

18         MR. HO:  Well, we requested January of 2008 until the

19  present.  I think we'd be willing to lop off the front end if,

20  you know, we made the request in April of 2008.  So I think the

21  key is we believe that we're entitled to a reset as of the time

22  that we requested it and so trailing six months to us runs

23  another risk of having a sample that's not representative of

24  the time period.

25         THE COURT:  Well let me tell you my, my thought was,

1  my thought was why not do - you could either do a slice, a

2  window.  They chose that six months, you get some period of

3  time or do a couple, maybe this is a practical question,

4  instead of six contiguous months do, you know, a period of some

5  set of one or two month windows that, across time to give you

6  seasonal variations, economic variations.  What about that?

7          MR. RINGEL:  I don't see that that should be

8  objectionable, Your Honor, if the total amount is six months at

9  least subject again to--

10         THE COURT:  I'm not committing to definitely six

11  months, but I'm just saying what if something less than the

12  whole period, maybe it's six months, maybe it's a little more,

13  but maybe it's one contiguous period as you suggested.  Maybe

14  it's, you know, two months here, two months here, two months

15  here or two, two, two, two or whatever, but that gives you a

16  different selection.  I mean it's not perfect information.

17         MR. HO:  Right.

18         THE COURT:  But—

19         MR. HO:  And I think we can work with a

20  representative sample in concept.  I think the one thing that

21  still concerns me is let's say that, you know, we leave the

22  room today and we negotiate a six month window where RNK is

23  going to provide us the information that we need.  Now RNK as

24  you know has a different theory of what the FX traffic means.

25  It has access to information across the entire time span for

44

1   all LATAs.  Now can they then use all, bring all of their data

2   to bear across all of the geographical regions--

3           THE COURT:  Why not just agree to litigate the whole

4   case on whatever the representational sample is?  You can all

5   make whatever arguments you want out of that data.  What about

6   that?

7           MR. HO:  I think that would have to be part of this

8   process.

9           MR. RINGEL:  I think we'd have to talk about it as

10  part of the process.  But I do want to emphasize because I'm a

11  little concerned that we're focusing so much on the data, the

12  threshold issue before we ever get to the data of course is the

13  definition which may render much of this data that Mr. Ho is

14  eager to have largely irrelevant.

15          THE COURT:  But at this stage they're entitled to get

16  the definition, the data the fits their definition even though

17  in the end they may lose their definition in the war.

18          MR. RINGEL:  Subject to have burden this non-

19  contractually rooted definition has.  Yes, I agree with Your

20  Honor and that's why we made the proposal.  I think Your

21  Honor's suggestion of the several month interim period might

22  make, might work.  I'd be happy to talk with them some more

23  about that.

24          THE COURT:  So let me ask you this then on this

25  motion cause I also, as interesting as this is, actually it is

1  quite interesting, I have a lot of other people stacked up for

2  other cases, there are two ways you can proceed on this motion,

3  all right.  I can just take it under advisement, issue a short

4  order and say this is what, this is how you ought to do it.

5  you can get a sense of what I'm thinking about, or I can give

6  you both a period of time in light of what I've been thinking

7  about to see if you can't come to some terms and then you

8  wither submit a proposal to me and if you, if you come to

9  agreement then that's, I'll tell you right now I'll probably

10  just do that.

11          If you don't come to an agreement, you might have it

12  framed.  You might say well we agreed mostly and then I might

13  just say okay, well, then I'll resolve it this way.  Or you

14  could, it'll be a short period of time.  I'm not talking about

15  a month, but a pretty short period of time.  Or you just can't

16  reach any agreement at all, stand on your positions, then I'll

17  reread the papers and I'll issue an order and decide what I

18  decide.  Do you want to--

19          MR. HO:  I think it might be economical for the Court

20  and beneficial to the parties if we had a little bit of time to

21  try to work something out.

22          THE COURT:  I agree.

23          MR. RINGEL:  I think that's right.

24          THE COURT:  Okay.  How much time do you think you

25  need?

46

1          MR. RINGEL:  Two weeks.

2          THE COURT:  Two weeks, fine.

3          MR. HO:  That'll be fine.

4          THE COURT:  How about you report to me two weeks,

5   either report to me in two weeks, either you'll report to me

6   this is what we, we've worked it out, withdraw the motion, this

7   is - and you can choose to tell me or not what you wish if

8   you're withdrawing it, or you have nothing, decide the motion

9   as it is or, you know, we've reached an agreement.  We've got

10  95 - the best would be if you either agree or you don't but,

11  you know, you're 95% and you disagree on is it six months or

12  nine months or whatever and then I'll decide.

13         MR. HO:  May I speak to the customer--

14         THE COURT:  Second motion.

15         MR. HO:  --identity issue--

16         THE COURT:  Yes, very briefly.

17         MR. HO:  --briefly?  It seems time that RNK's primary

18  argument is competitive sensitivity and every case that I've

19  seen suggests that the proper resolution of that kind of

20  concern assuming that it exists is a protective order.  And we

21  have a protective order in this case that not only prohibits

22  public disclosure of the customers' identity but also prohibits

23  that information from being disclosed to Verizon employees that

24  operate in a competitive capacity vis-a-vis RNK.

25         The one case that RNK cites interestingly enough is a

1  case in which a magistrate judge down in the Southern District

2  of New York said due to these competitive concerns the

3  plaintiff isn't entitled to this information at all.  And Judge

4  Shyland (ph) said, no, you know, a protective order is the

5  proper way to resolve that kind of concern.

6          THE COURT:  Would you view this information under the

7  protective order as attorney's eyes only or attorney and

8  customer?

9          MR. HO:  WE, right now we don't have a pure

10 attorney's eyes only category.  What we have is highly

11 confidential which allows two Verizon in-house attorneys who

12 have primary supervision for the case, but it prohibits

13 disclosure to anyone at Verizon that operates in a competitive

14 capacity vis-a-vis RNK, and that was hammered out over many,

15 many weeks--

16         THE COURT:  Briefly, what do you say about this?

17         MR RINGEL:  A number of points.  First, Your Honor,

18 in describing the need for the content information, Mr. Ho

19 referred to two factors.  One he said we weren't sure that we

20 would get all the information.  It may be that RNK doesn't have

21 the data so that's why we need to go to the customers.  In fact

22 I think the proposal Your Honor has made may eliminate that

23 need, if you will, to the customer information altogether.  And

24 our other concern is not simply one of business confidentiality

25 and competitiveness.  That is a concern and I'll speak to that

48

1  in a moment.  There really is a cause for some concern about

2  the potential for harassment.  These are people who decidedly

3  don't want to deal with Verizon.  There are very strong

4  feelings had been customers.  It is plain that what Verizon

5  intends to do if he gets this information is to contact these

6  people.  I'm not saying illegitimately, but to contact them

7  that in itself can be viewed as something the customer said I

8  didn't bargain for that when I signed up with RNK to get calls

9  from Verizon's lawyers.

10        Let me speak to the confidentiality and the

11  confidential order.

12        THE COURT:  Uh-huh.

13        MR. RINGEL:  As Your Honor's question correctly

14  focused in on there is no category where maturing will not go

15  to in-house Verizon people who have some potential role in

16  competition.  The lawyers for example, in-house lawyers are the

17  very people my clients think are most likely to be able to make

18  use of that.  Beyond that the confidentiality order we tried

19  hard to get a better clause, negotiation didn't lead beyond

20  this, was one that says the various people on the order, and it

21  can be anyone in Verizon who gets access to it.  It may not be

22  currently involved in competition.  It doesn't say anything

23  about the future, tomorrow.

24        Beyond that, every one of the people who was

25  identified in the initial disclosure list who plainly are in

49

1   competition with RNK are given access under this highly

2   confidential order.  Simply there is no reason to give the

3   information in the first place, and I don't think the

4   protective order provides enough protection.  We think that

5   Your Honor's proposal--

6          THE COURT:  One quick question and then--

7          MR. RINGEL:  Sounds good, yeah.

8          THE COURT:  --we'll run it done.  Actually for Mr.

9   Ho, suppose you get the customer names, what would you do with

10   them?

11          MR. HO:  Thank you for asking, Your Honor, because

12   it's not true that as Mr. Ringel posits that we'll just

13   immediately go start subpoenaing customers.  A, there's a lot

14   of information publicly available about these companies that we

15   could research in order, again to try to verify information

16   that we receive or in order to fill in gaps in the records of

17   RNK.  Second, there is some, the potential for some information

18   within Verizon that Verizon legitimately has about these

19   customers that again we can bring to bear.  So the idea that

20   what we're trying to do is harass RNK's customers by

21   immediately taking this list and serving an infinite number of

22   subpoenas--

23          THE COURT:  I don't think he said you're intending to

24   harass them as much as that you might be intending to something

25   legitimate but they might feel harassed.

50

1    MR. HO:  Or the idea that we're just going to start

2    subpoenaing customers--

3    THE COURT:  Right.

4    MR. HO:  --right off the bat because we can--

5    THE COURT:  Do your due diligence and the subpoena

6    them.

7    MR. HO:  Well, the only situation in which I can

8    imagine that we would have to subpoena a customer is if RNK

9    itself doesn't have the information that we're looking for.

10    THE COURT:  But what would you be looking for?

11    MR. HO:  Where is your customer station?

12    THE COURT:  I see.  So if they, as to the people, say

13    as to anyone they give you the customer station for, you're

14    really just doing the other research to verify to do it as a

15    check, but if they don't know then that's when you might want

16    to go to the customer?

17    MR. HO:  Exactly, Your Honor.

18    THE COURT:  I see.  Okay.  Okay, I'm going to take –

19    I'll wait two weeks.  You'll file something in two weeks, just

20    file a joint report telling me where you are on that issue and

21    then I'll wait to do anything on the motions.

22    MR. RINGEL:  Thank you, Your Honor.

23    MR. HO:  Thank you, Your Honor.

24    THE COURT:  There's your motion.

25    MR. RINGEL:  There is a motion, yes.

51

1          THE COURT:  Let me cut to the chase on that, why

2     wouldn't a 30(b)(6) at least at the outset be sufficient on

3     this issue?

4          MR. RINGEL:  Your Honor, that is an alternative but

5     we think that there is sufficient documentation out there.  If

6     I may I would like to hand up one document which does bear on

7     this--

8          THE COURT:  All right.

9          MR. RINGEL:  --which we obtained as part of

10    discovery.  This is a complaint not produced in response to

11    Rule 52, to request 52 rather which is what we were talking

12    about here.  This is brought in the Maryland public service

13    commission.  It was produced by Verizon and if Your Honor would

14    turn to--

15         THE COURT:  This essentially says they're not paying

16    on time and they're doing it for an improper purpose?

17         MR. RINGEL:  Precisely so.  Precisely so.  We think

18    these are documents, they know perfectly well where they are.

19    They can identify them.  We think we're entitled to their

20    production.  I appreciate that 30(b)(6) is another way of

21    beginning to get at it, but I think this really would be a more

22    efficient way and the we can conduct a 30(b)(6) or specific

23    party depositions directed to this.  I mean this is such an

24    easily identifiable document.  I don't think--

25         THE COURT:  Briefly Mr. Ho what do you say about some

52

1  universe of documents along the lines of what they're seeking?

2         MR. HO:  I think, A) Verizon's conduct vis-a-vi RNK.

3  This is not an antitrust case.  It doesn't implicate, harm the

4  competition.  It doesn't implicate what Verizon may or may not

5  have in terms of disputes with other customers, and there is

6  not a single case that's cited by RNK or that I've been able--

7         THE COURT:  Well ,but if suppose the answer is the

8  reason there were these delays in the billing was because they

9  need to research this kind of information, okay, to figure this

10 out or some problem specific to RNK.  I agree the primary

11 evidence is between Verizon and RNK.  That's more dispositive

12 and more significant.  But why wouldn't this other information

13 about - it potentially could impeach the explanation Verizon

14 advances depending on, I mean that's what their theory is,

15 right, that's why they want it.  They think it might.  It might

16 have some, it might have relevance in that regard, right?

17        MR. HO:  Well, I think, you know, the one case that

18 seems to me to be almost directly on point is the *Pedraza* that

19 we cite, *Pedraza* against *Holiday Housewares*.  It was an opinion

20 by Judge Gorton of this court.  There was an employee that was

21 suing an employer for employment discrimination.  The

22 employer's management also was the management of another

23 company that had had five complaints of employment

24 discrimination filed against them.  The employee said I'd like

25 to start deposing people about those other complaints because

53

1    maybe that would shed light on what happened in my case.  And

2    what Judge Gorton said was where you are really going well

3    beyond the bounds of the natural focus of the inquiry that's

4    created by the complaint, you really have to have a heightened

5    showing that either this is, you have a particular need for

6    this information or that there is a very high likelihood that

7    this information is going to be relevant, otherwise in any case

8    involving intentional, a claim of intentional conduct by one

9    company against another, you open the floodgates to discovery

10   about anything else that the defendant allegedly may have done

11   in a similar vain to another party.  And again, these are only

12   allegations.

13            THE COURT:  Right.

14            MR. HO:  So this is kind of leading us down an

15   untenable path.  We're going to have to defend against each one

16   of these allegations if we're to sort out whether--

17            THE COURT:  Ten lawsuits in one so to speak.

18            MR. HO:  Yeah.  Exactly, Your Honor.

19            THE COURT:  Okay.

20            MR. RINGEL:  Briefly, Your Honor, because I see you

21   have a full calendar.

22            THE COURT:  Five seconds.

23            MR. RINGEL:  Two cases that we think bear directly on

24   this.  We cite to you the *Smithfield* case where the Court--

25            THE COURT:  Smithfield?

54

1        MR. RINGEL:  Yes.  And – (inaudible - #3:04:32) -

2   decision, the Court specifically finds that this kind of

3   information is relevant as to most--

4        THE COURT:  What's the other case?

5        MR. RINGEL:  The second case is the, if I can

6   pronounce, *Koninklijke Philips Electronics v. KXD* where there

7   was a very specific determination that on willfulness, again--

8        THE COURT:  Okay.

9        MR. RINGEL:  --an element here, this would be

10  admissible information.

11       THE COURT:  I'll take--

12       MR. HO:  Briefly, Your Honor, this is an industry

13  where there has been more than a little acrimony between the

14  parties.  The allegation of intentionality has some grounding

15  in private industry.

16       THE COURT:  All right.

17       MR. RINGEL:  We address both of those cases in our

18  brief.

19       THE COURT:  All right, I'll take that motion under

20  advisement and I will wait for the – as to the schedule why

21  don't you all talk to each other about and just file a proposal

22  as to the schedule with a two-week status report for the

23  remainder of the case.

24       MR. RINGEL:  Okay.  Thank you, Your Honor.

25       MR. HO:  Thank you, Your Honor.  Appreciate it.

55

1          THE COURT:  We're adjourned.  Thank you very much.

2          THE CLERK:  This matter's adjourned.

3  //

4  //

5  //

6  //

7  //

8  //

9  //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

56

1                          CERTIFICATION

2          I, Maryann V. Young, court approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    digital sound recording of the proceedings in the

5    above-entitled matter.

6

7    /s/ Maryann V. Young                    September 28, 2009

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25